# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| LIBERTY UNIVERSITY, INC., | CASE NO. 6:13-cv-00033 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| CITIZENS INSURANCE CO. OF AMERICA, HANOVER AMERICAN INSURANCE CO., AND HANOVER INSURANCE CO., | |
| | JUDGE NORMAN K. MOON |
| *Defendants.* | |

This case comes before the Court upon the parties' cross motions for summary judgment (dockets nos. 39 and 42), filed on January 31, 2014.  Liberty University, Inc. ("Plaintiff" or "Liberty") filed this action, seeking a declaration from this Court that Citizens Insurance Company of America, Hanover American Insurance Company, and Hanover Insurance Company (collectively, "Defendants" or "Hanover") have a duty to defend Liberty against claims made in an amended complaint by Janet Jenkins ("Jenkins Complaint") in the United States District Court in the District of Vermont,[1] based on insurance policies issued by Hanover to Liberty.  In its June 28, 2013 amended complaint ("Amended Complaint"), Liberty seeks reimbursement of the costs, fees, and expenses Hanover allegedly owes Liberty for breaching its duty to defend and indemnify[2] under the policies.  Hanover disputes that Liberty is covered under the policies at issue.  This Court heard argument on the fully-briefed motions for summary judgment on February 27, 2014.

---

[1] *See* Am. Compl., Nov. 26, 2012, in *Jenkins v. Miller et al.*, No. 2:12-cv-00184-wks, ECF No. 59.  The Jenkins Complaint can be found in the Joint Appendix (hereinafter "J.A.") (docket no. 41), at Exhibit A.

[2] Although Liberty seeks these remedies in its Amended Complaint, the parties have agreed to limit their motions to Hanover's duty to defend.  Hanover's duty to indemnify is not before the Court at this time.

Jurisdiction over this case is proper pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.  Personal jurisdiction and venue are also proper in this Court.  For the reasons stated below, I find Hanover has a duty to defend Liberty under all the insurance policies at issue, in relation to the Jenkins Complaint, filed on Nov. 26, 2012, in *Jenkins v. Miller et al.*, No. 2:12-cv-00184-wks, in the District of Vermont. I will therefore grant Liberty's motion for summary judgment (docket no. 39) in full, and deny Hanover's motion for summary judgment (docket no. 42) in full.

## II. BACKGROUND

Liberty University is a Virginia corporation that operates Liberty University and the Liberty University School of Law in Lynchburg, Virginia.  Citizens Insurance Company of America, Hanover American Insurance Company, and Hanover Insurance Company are corporations organized under the laws of Michigan and New Hampshire, which regularly conduct business in Virginia and have principal places of business in Michigan and Massachusetts.  Each of these companies issued at least one insurance policy to Liberty that underlies this dispute.

Four[3] different policies issued to Liberty are at issue: (1) the Commercial General Liability ("CGL") Policy, number ZZR 4908180-00, issued by Hanover American Insurance Company for the policy period of February 1, 2009, to February 1, 2010; (2) the Umbrella Policy ("2009-2010 Umbrella Policy" or "CGL Umbrella Policy"), number UHR 4908175-00, issued by Hanover Insurance Company for the policy period of February 1, 2009, to February 1, 2010; (3) the School and Educators Legal Liability Endorsement ("SELL Endorsement") to the 2012-2013 commercial general liability policy, number ZBR-4908180-03, issued by Citizens

---

[3] Plaintiff requests relief under three of these policies in the Amended Complaint, but the parties have also briefed whether Hanover has a duty to defend under a fourth policy, so I will address coverage under that policy as well.

Insurance Company of America for the policy period of February 1, 2012, to February 1, 2013; and (4) the 2012-2013 Umbrella Policy ("2012-2013 Umbrella Policy"), number UHR 4908175-03, issued by Hanover Insurance Company for the policy period of February 1, 2012, to February 1, 2013. Am. Compl. ¶¶ 8–10; Defs.' Mot. for Summ. J. ¶¶ 8–9.

The 2009-2010 CGL Policy provides coverage for claims made against Liberty for "bodily injury," "property damage," and "personal and advertising injury" arising from an "occurrence" taking place during the policy period. Pl.'s Mot. for Summ. J. 10; J.A. Ex. B. The CGL Umbrella Policy is effective for the same dates as the CGL Policy and provides coverage for "the 'ultimate net loss' in excess of the 'retained limit'" for the same eventualities: bodily injury, property damage, and personal and advertising injury, defined in the same way as in the CGL Policy. CGL Umbrella Policy, J.A. Ex. C, atH-0015–H-0016, H-0018–H-0019, H-0027–H-0028, H-0031. Since the CGL and CGL Umbrella Policies apply here to the same eventualities, with the same exclusions and definitions, Liberty and Hanover have adopted their arguments for the CGL Policy and rely on those arguments as to whether the CGL Umbrella Policy covers Liberty and creates a duty for Hanover to defend. *See* Pl.'s Mot. for Summ. J. 21; Defs.' Mot. for Summ. J. 18; Defs.' Resp. to Pl.'s Mot. for Summ. J. 20.

The 2012-2013 SELL Endorsement covers claims made against Liberty that were first asserted in the relevant policy period and based on "wrongful acts" by Liberty. Pl.'s Mot. for Summ. J. 10; J.A. Ex. D. As with the CGL Umbrella Policy, the parties rely on their arguments regarding the SELL Endorsement as to whether the SELL Endorsement to the 2012-2013 Umbrella Policy provides coverage for any "wrongful acts" by Liberty. *See* Pl.'s Mot. for Summ. J. 25; Defs.' Mot. for Summ. J. 31; Defs.' Resp. to Pl.'s Mot. for Summ. J. 23–24; J.A. Ex. E, at H-0325–H-0326, H-0329–H0330, H-0338–H-0341, H-0343, H-0358–H-0360, H-0371.

The parties have summarized the facts pertinent to this case in their motions for summary judgment, and they were enumerated in the Jenkins Complaint.[4]   In 2002, Janet Jenkins ("Jenkins") and Lisa Miller ("Miller") were united in a same sex civil union in Vermont when their daughter Isabella Miller-Jenkins ("Isabella") was born.  Pl.'s Mot. for Summ. J. 6; Jenkins Compl. ¶ 19.  In 2004, Miller converted to Christianity, began to believe that "homosexuality was sinful and that Isabella should be shielded from exposure to the 'lifestyle,'" and moved with Isabella to Winchester, Virginia.  Pl.'s Mot. for Summ. J. 7; Jenkins Compl. ¶ 20.  Miller sought to legally dissolve her civil union with Jenkins in 2004 and between 2004 and 2009, Miller and Jenkins "were engaged in litigation regarding their respective parental rights and custody over Isabella."  Pl.'s Mot. for Summ. J. 7; Jenkins Compl. ¶¶ 19–20.  During this time, Miller repeatedly violated the orders of courts in Vermont and Virginia that granted Jenkins certain custody and visitation rights.

Beginning in 2004, Liberty University and its related law firm, Liberty Counsel, LLC, began to represent Miller in her custody and dissolution disputes.  The Jenkins Complaint alleged that Miller's "lead attorneys were Dean of the [Liberty] Law School Mathew Staver, and Rena Lindevaldsen, a law professor there."  Jenkins Compl. ¶ 22.  In April 2007, Miller and Jenkins' civil union was dissolved after a final, contested hearing at which Miller swore to "comply with court orders" regarding Jenkins' contact with Isabella.  Jenkins Compl. ¶ 23.  Miller complied with many such court orders throughout 2007, but in the spring of 2008 she moved with Isabella to Lynchburg, Virginia, joined Thomas Road Baptist Church ("TRBC"), and thereafter was "counseled by church members and pastors not to allow contact between Isabella and Janet Jenkins."  Jenkins Compl. ¶¶ 24–25.  TRBC allegedly provided Miller "with

---

[4] The underlying facts are not in dispute, only what inferences follow from the facts and how they should be interpreted legally under the insurance contracts.

housing, a job [at Liberty Christian Academy,] and a vehicle."  Jenkins Compl. ¶ 25.  According to the Jenkins Complaint, "Liberty University is held out as a 'related ministry' of Thomas Road Baptist Church," but the church is a separate corporation in Virginia.  Jenkins Compl. ¶ 16.

At TRBC, Miller developed a friendship with TRBC member Linda Wall, who allegedly agreed Miller should "flee with Isabella" and later helped to organize the "Protect Isabella Coalition [("PIC")] . . . to prevent court ordered contact between Isabella Miller-Jenkins and Janet Jenkins."  Jenkins Compl. ¶¶ 22, 26–27.  "Upon information and belief," the Jenkins Complaint alleged that "President of Liberty University, Jerry Falwell, Jr. donated substantial sums to the PIC to enable it to produce television and radio commercials condemning the parent-child contact between Janet Jenkins and Isabella Miller-Jenkins as an act of tyranny."  Jenkins Compl. ¶ 27.  Miller's "attorneys had established a Facebook site and other social media to solicit donations to their organization on behalf of Lisa Miller, and the Facebook site was also used to promote the activities of Lisa Miller and the PIC."  Jenkins Compl. ¶ 27.

In 2009, after Miller defied various court orders regarding visitation between Jenkins and Isabella, motions were filed and hearings were held in the Vermont and Virginia courts on the future status of Isabella's custody and on whether to hold Miller in contempt.  Jenkins Compl. ¶¶ 28–31.  Allegedly, "by the late summer of 2009, Lisa Miller and her co-conspirators had devised a plan to kidnap Isabella and avoid detection by infiltrating the Beachy Amish-Mennonite Christian Brotherhood to enable [Miller's] abduction of Isabella."  Jenkins Compl. ¶ 34.  On August 25, 2009, a Virginia court held Miller in contempt and "fined her $100 per day for any future days of missed contact" between Isabella and Jenkins.  Jenkins Compl. ¶ 31.  Miller appeared at the hearing and held a press conference, at which her attorneys Staver and Lindevaldsen were present.  On September 4, 2009, after a hearing at which Miller's attorneys

appeared by telephone, a Vermont court ordered contact between Jenkins and Isabella from September 25, 2009 until September 27, 2009.  Jenkins Compl. ¶ 32.

Beginning in late May 2009, Miller allegedly began making contact with individual defendants who were involved with Response Unlimited, Inc., and the Beachy Amish-Mennonite Christian Brotherhood (hereinafter "Brotherhood") to arrange transportation and living arrangements for herself and Isabella outside of the United States.  This included initially making contact in May 2009 with Philip Zodhiates ("Zodhiates") at Response Unlimited, Inc., and on September 21, 2009, being transported to the Canadian border, in disguise, by Zodhiates. Jenkins Compl. ¶¶ 29, 34–36.  Zodhiates allegedly also conspired with the Brotherhood to purchase plane tickets and arrange transportation from Canada to Nicaragua, where Miller and Isabella would take up secret residence with the Brotherhood.  Jenkins Compl. ¶¶ 36–39. Jenkins alleged she had not seen or heard from Isabella since Isabella was taken in 2009.  Jenkins Compl. ¶ 40.

None of the individual defendants who allegedly aided Miller in taking Isabella to Nicaragua were alleged to have been acting as agents or employees of Liberty University.[5]  The

[5] Hanover argued in the hearing and in its response to Liberty's Motion for Summary Judgment that "Linda Wall is expressly alleged to be an agent of Liberty University," and that other individual defendants were also alleged to be agents of Liberty. Defs.' Resp. to Pl.'s Mot. for Summ. J. 3–4 (citing Jenkins Compl. ¶¶ 10–11, 13, 54, 62, 64). This is incorrect. Paragraph 64 of the Jenkins Complaint is illustrative: it alleges that Miller "conspire[d] with, and was aided and abetted by Response Unlimited, Inc., . . . Victoria Hyden, f/k/a Victoria Zodhiates, individually and as an agent of Response Unlimited, Inc,. [sic] and Liberty University, . . . Linda Wall, individually and as an agent of Thomas Road Baptist Church, Thomas Road Baptist Church and its related ministry Liberty University." Jenkins Compl. ¶ 64.  The complaint is simply listing alleged co-conspirators and making connections between them.  It identifies both the organizations themselves and each individual person allegedly involved, along with any connections between those individual persons and the organizations at issue.  In context, it is clear that Linda Wall is alleged only to be an "agent of Thomas Road Baptist Church." *See also* Jenkins Compl. ¶ 17 (alleging only that "Defendant Linda Wall is . . . an agent of TRBC . . . .").  Following the comma after that allegation, Thomas Road Baptist Church is listed again, to allege it as an organizational co-conspirator in its own right, followed by Liberty University, also listed as a co-conspirator in its organizational form.  Paragraph 54 similarly identifies individual defendants and alleges they acted "in their individual capacities and as agents of Response Unlimited and Liberty University."  Jenkins Compl. ¶ 54.  Read carefully and in context, neither the paragraphs Hanover cites nor the Jenkins Complaint as a whole alleged that any defendant other than Victoria Hyden/Zodhiates acted as an agent of Liberty University.  Hyden was alleged to have helped arrange transportation for Miller to Canada, but she is not alleged to have been acting as an agent of Liberty in that specific paragraph. Jenkins Compl. 41.

6

Jenkins Complaint drew a few connections between these defendants and Liberty University. First, although the complaint acknowledged that Staver and Lindevaldsen "have at all times maintained that they did not know [Miller's] location . . . [and] that she simply stopped communicating with them and disappeared," the Jenkins Complaint suggested that Staver, and perhaps Lindevaldsen, communicated with Philip Zodhiates as Zodhiates returned from taking Miller and Isabella to the Canadian border:

> [P]hone records . . . showed phone calls made from Philip Zodhiates's cell phone between 1:28pm and 1:30pm on September 22, 2009, to a cell phone with an Orlando area code that is registered to Liberty Counsel, a landline registered to Liberty Counsel, and a landline registered to Liberty University. Mathew Staver, Dean of Liberty University, splits his time between Lynchburg, Virginia and Orlando, Florida. At the time that the calls were made, Philip Zodhiates was still en route back to Virginia after depositing Lisa Miller and Isabella near the Canadian border.

Jenkins Compl. ¶¶ 57–58.

The Jenkins Complaint also alleged on information and belief that "law school employees who spoke to Victoria [Hyden/Zhodiates] about Lisa Miller's whereabouts were too intimidated to come forward to law enforcement for fear of angering Dean Staver [but not Liberty] and losing their jobs." Jenkins Compl. ¶ 59. Hyden/Zhodiates allegedly knew Miller's whereabouts, but was still employed by Liberty Law School as of November 2012. In contrast, while Miller and Isabella were missing, "Dean Staver fired several members of the admissions and financial aid departments who were under his supervision," and Staver and Lindevaldsen pursued Miller's appeals through 2010, "stating that they had advance instructions from Lisa Miller as to her wishes for the ongoing litigation." Jenkins Compl. ¶ 59.

Otherwise, the Jenkins Complaint tied Liberty to Isabella's disappearance through general allegations directed at all of the defendants and through specific allegations involving "Victoria Hyden f/k/a Victoria Zhodiates" (hereinafter "Victoria Hyden" or "Hyden"). Jenkins

7

Compl. ¶ 13.   Victoria Hyden was identified as an "employee and agent of both Liberty University, Inc., and its related ministry Thomas Road Baptist Church, Inc., and Response Unlimited, Inc.," Zhodiates' daughter, "an employee of Response Unlimited, Inc., and also a 'student worker' at Liberty University."  Jenkins Compl. ¶¶ 13, 41, 49.  The Jenkins Complaint alleged on information and belief that in 2009, Hyden:

> [S]ent an email . . . to her coworkers at the law school requesting donations for supplies to send to Lisa Miller to enable her to remain outside the country.  Lisa Miller's attorney, Matthew Staver was the Dean of the Law school and Ms. Zodhiates's boss. . . . On September 20, 2009, both Philip Zodhiates and Victoria Hyden called Lisa Miller's father, Terry Miller in Tennessee to assist in arranging her and Isabella's transportation from a Walmart parking lot in Lynchburg, Virginia to Waynesboro, Virginia, from whence they would depart for Canada and Nicaragua the next day.

Jenkins Compl. ¶ 41.   Allegedly, Victoria Hyden also "knew of Lisa Miller's whereabouts."  Jenkins Compl. ¶ 59.

The Jenkins Complaint also alleged that Staver and Lindevaldsen publicly advocated for Miller outside their roles as legal counsel.  Lindevaldsen allegedly founded and administrated a "Facebook site called 'Only One Mommy' . . . to solicit donations and support for the case."  Jenkins Compl. ¶ 43.   "[Staver and Lindevaldsen] also routinely instructed their Law School students that the correct course of action for a person in Lisa Miller's situation would be to engage in 'civil disobedience' and defy court orders."  Jenkins Compl. ¶ 47.

After alleging these activities by Staver and Lindevaldsen, the Jenkins Complaint described public statements made by pastors and members of TRBC regarding civil disobedience and the Miller case, and concluded:

> Hence, Defendants TRBC and its related ministry Liberty University encouraged its agents to disregard state laws governing parental rights, particularly Vermont's law giving rights to members of same-sex families.  The TRBC and Liberty University through its public declaration promoted, condoned and explicitly ratified its agent's tortuous, racketeering activity.  These agents and

8

employees have followed this direction, making TRBC and Liberty University liable in *respondeat superior* for the consequences.

Jenkins Compl. ¶ 49.

Finally, Lindevaldsen published a book entitled *Only One Mommy: A Woman's Battle for Her Life, Her Daughter, and Her Freedom: The Lisa Miller Story*, about Miller and the case, "citing portions of Lisa Miller's personal diaries which Lindevaldsen has stated were entrusted to her before Lisa Miller disappeared."  Jenkins Compl. ¶ 60.  Lindevaldsen and Staver promoted this book on radio and television, and Lindevaldsen publicly criticized law enforcement and the federal government for their pursuit of Miller and Isabella.  Jenkins Compl. ¶ 60.

Based on these allegations, the Jenkins Complaint then generally alleged that Liberty conspired to kidnap Isabella, racketeered to kidnap Isabella, and conspired to violate Jenkins and Isabella's civil rights:

> Based on the foregoing, all of the Defendants named herein, in both their individual capacities and as agents of TRBC, Liberty University, Response Unlimited, Inc., and CAM are liable for conspiring with Lisa Miller to kidnap Isabella Miller-Jenkins, assure her continued detention outside the State of Vermont, and for conspiring with Kenneth Miller to participate in the affairs of the [Brotherhood] through a pattern of racketeering activity.  Defendants are also liable for conspiring to violate Janet Jenkins' and Isabella Miller Jenkins' rights to a parent-child relationship on account of Isabella having two mothers instead of a mother and a father . . . .

Jenkins Compl. ¶ 62.  In each count, the Jenkins Complaint alleged that either Lisa Miller or Kenneth Miller "did conspire with, and was aided and abetted by[, *inter alia*,] . . . Victoria Hyden, f/k/a Victoria Zodhiates, individually and as agent of Response Unlimited, Inc,. [sic] and Liberty University, . . . Thomas Road Baptist Church and its related ministry Liberty University."  Jenkins Compl. ¶¶ 64, 72, 75.  Liberty was thus generally implicated alone and through its alleged agent Hyden, in Count I (Intentional Tort of Kidnapping), Count III (Violation of RICO), and Count IV (Conspiracy to Violate Civil Rights).

9

As a result of these legal violations, the Jenkins Complaint alleged that Jenkins suffered "extreme emotional distress and the loss of her daughter's companionship," has "incurred legal fees and lost business as a result of having to close her daycare center in order to attend contempt and other Court hearings, an[d] meetings with law enforcement necessary to locate her daughter . . . [and] has also been unable to collect court ordered fines."  Jenkins Compl. ¶¶ 78–79.

Isabella was alleged to have suffered "emotional distress as a result of the abduction," including from "living in isolation and having a difficult time," with her "freedom of movement severely restricted by the [Brotherhood]," and experiencing a "standard of living . . . far below what even the poorest children in the United States experience."  Jenkins Compl. ¶ 80.  Isabella also allegedly suffered "the loss of emotional and financial support from her mother, Janet Jenkins," including "child support from one or both parents based on her needs and best interests," which used to be "$250 per month."  Jenkins Compl. ¶ 81.  The Jenkins Complaint also alleged in 2012 that Isabella was "currently being deprived of an education, medical and dental care and the support of her extended family, including grandparents Ruth and Claude Jenkins.  All of these factors currently and will in the future result in an injury to Isabella's property and future business and employment."  Jenkins Compl. ¶ 81.

### III. LEGAL STANDARD

### A. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment (or partial summary judgment) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.  See also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250.  In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

When faced with cross-motions for summary judgment, the standard is the same. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (quotations omitted). If the court finds that there is a genuine issue of material fact, both motions must be denied. "But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Trigo v. Travelers Commercial Ins. Co.*, 755 F. Supp. 2d 749, 752 (W.D. Va. 2010).

### B.  Virginia Insurance Law

This insurance contract dispute is before the Court under its diversity jurisdiction, and therefore state law will apply.  *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938).  Virginia is the forum state, so its choice-of-law rules govern and mandate that "generally, the law of the place where an insurance contract is written and delivered controls issues as to coverage." *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Block Roofing Corp.*, 754 F. Supp. 2d 819, 822 (E.D.

11

Va. 2010) (citing *Capitol Environmental Servs., Inc. v. North River Ins. Co.*, 536 F. Supp. 2d

633, 639 (E.D. Va. 2008) and *Buchanan v. Doe,* 431 S.E.2d 289, 291 (Va. 1993)).  Here, the

parties do not dispute that the contract was delivered in Virginia, nor that Virginia law governs

this dispute over its terms.

    Virginia applies the "Eight Corners Rule" to determine whether an insurer has a duty to

defend its insured.  This rule "requires a court to compare the four corners of the insurance

policy against the four corners of the underlying complaint."  *Id.* at 822–23.  A duty to defend

"arises whenever the complaint [against the insured] alleges facts and circumstances, some of

which, if proved, fall within the risk covered by the policy" or would be "potentially covered by

the policy."  *See id.*; *VEPCA v. Northbrook Property & Cas. Ins.,* 475 S.E.2d 264, 265 (Va.

1996) (quoting *Lerner v. Safeco,* 245 S.E.2d 249, 251 (Va. 1978)).

    A burden-shifting framework governs duty to defend disputes.  First, the insured must

establish a *prima facie* case that coverage should be triggered.  *Block*, 754 F. Supp. 2d at 823

(citing *Maryland Cas. Co. v. Cole,* 158 S.E. 873, 876 (Va. 1931)).  "Yet this burden is not

especially onerous since the insurer must defend unless it clearly appears from the initial

pleading the insurer would not be liable under the policy contract for *any* judgment based upon

the allegations."  *Id.*  If the insured meets that initial burden, the insurer must then prove any

policy exclusions should apply to bar coverage.  *Id.*

    Finally, courts construing insurance contracts in Virginia must "give the language its

plain and ordinary meaning and enforce the policy as written," if that language "is clear and

unambiguous."  *Id.*  Policy provisions are not ambiguous simply because the parties disagree

about their meanings, but only if the language is "capable of more than one reasonable

meaning," in context.  *Id.*  For unambiguous provisions, "[w]ords that the parties used are

normally given their usual, ordinary and popular meaning," such that "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it," with the "presumption that the parties have not used words needlessly." *City of Chesapeake v. State Self-Insurers Risk Retention Grp, Inc.*, 628 S.E.2d 539, 628 (Va. 2006). In Virginia, any ambiguities must be construed against the insurer. *Block*, 754 F. Supp. 2d at 823 (citing *Craig v. Dye,* 526 S.E.2d 9 (Va. 2000)). Exclusionary language is also "construed most strongly against the insurer and the burden is upon the insurer to prove that an exclusion applies. Reasonable exclusions not in conflict with statute will be enforced, but it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous." *Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 585 (Va. 1989) (citations omitted).

## IV. DISCUSSION

The parties do not dispute the content of the Jenkins Complaint or the content of the insurance policies at issue. Whether these undisputed material facts give rise to Hanover's duty to defend is a matter of law, which this Court will interpret in the context of the Jenkins Complaint and the contracts at issue.

### A. 2009-2010 CGL and CGL Umbrella Policies[6]

The CGL Policy provides coverage for claims made against Liberty for bodily injury, property damage, and personal or advertising injury arising from an occurrence that took place during the policy period, from February 2009 through February 2010. J.A. Ex. B. Under the CGL Policy, "bodily injury" is defined as "bodily injury, disability, sickness or disease sustained by a person, including death resulting from any of these at any time. 'Bodily injury' includes mental anguish or other mental injury resulting from bodily injury." CGL Policy, J.A. Ex. B, at

---

[6] The CGL and CGL Umbrella Policies essentially provide coverage for the same eventualities, employing the same terms and exclusions. Therefore, as the parties have done, I will adopt my analysis of whether the CGL Policy triggers Hanover's duty to defend to decide whether Hanover has a duty to defend under the CGL Umbrella Policy.

HAIC-0189.  "Property damage" means "[p]hysical injury to tangible property, including all resulting use of that property," or "[l]oss of use of tangible property that is not physically injured."   CGL Policy, J.A. Ex. B, at HAIC-0210–HAIC-0211.  "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  CGL Policy, J.A. Ex. B, at HAIC-0197.  The CGL Policy excludes from coverage "'Bodily injury' or 'property damage' *expected or intended from the standpoint of the insured*."  CGL Policy, J.A. Ex. B, at HAIC-0198.

The CGL Policy also provides coverage for "sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which [the CGL Policy] applies."  CGL Policy, J.A. Ex. B, at HAIC-0201.  "Personal and advertising injury" must be "caused by an offense arising out of [Liberty's] business," defined as "injury including consequential 'bodily injury', arising out of one or more of the following offenses:"

a.   False arrest, detention, or imprisonment;
b.   Malicious prosecution;
c.   The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf o fits owner, landlord or lessor;
d.   Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
e.    Oral or written publication, in any manner, of material that violates a person's right of privacy;
f.   The use of another's advertising idea in your 'advertisement'; or
g.   Infringing upon another's copyright, trade dress or slogan in your 'advertisement.'

CGL Policy, J.A. Ex. B, at HAIC-0201–HAIC-0202, HAIC-0210.  Coverage for personal and advertising injury is excluded under the "Knowing Violation of Rights Of Another" exclusion if that injury was "*caused by or at the direction of the insured* with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'"  CGL Policy, J.A. Ex. B, at HAIC-0202.  Personal and advertising injury "arising out of a *criminal act*

*committed by or at the direction of the insured*" is also excluded from coverage in the "Criminal

Acts" exclusion.  CGL Policy, J.A. Ex. B, at HAIC-0202.

Finally, the 2009 CGL Policy contains a "separation of insureds" clause that provides:

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage part to the first Named Insured, this insurance applies:
a. As if each Named Insured were the only Named Insured; and
b. Separately to each insured against whom claim is made or 'suit' is brought.

CGL Policy, J.A. Ex. B, at HAIC-0208.

The CGL and CGL Umbrella Policies contain two different coverage provisions.  The

first is Coverage A, under which Liberty is insured for "bodily injury" or "property damage"

related to an "occurrence" that is not excluded as an expected or intended occurrence.  Coverage

B provides separate coverage for "'personal and advertising injury' caused by an offense arising

out of [Liberty's] business," and not excluded as having been caused or directed by Liberty's

knowing violation of the rights of another or by Liberty's commission or direction of criminal

acts. CGL Policy, J.A. Ex. B, at HAIC 0201, HAIC-0202, HAIC-0210.

## 1. <u>Coverage A of the CGL Policy</u>

### a) "Bodily Injury" under Coverage A of the CGL Policy

The 2009 CGL and CGL Umbrella policies[7] define "bodily injury" as: "*bodily injury,*

*disability, sickness or disease* sustained by a person," including "mental anguish or other mental

injury *resulting from* bodily injury."  CGL Policy, J.A. Ex. B, at HAIC-0189 (emphasis added).

Hanover argues the Complaint does not allege covered bodily injury, only non-qualifying

emotional distress and physical deprivation that allegedly occurred outside the policy period.

---

[7] Since the policies define the terms at issue in identical ways, I will refer mostly to the 2009 CGL Policy in this opinion, with the understanding that this analysis applies to both the 2009 CGL and 2009 CGL Umbrella policies.

As of November 26, 2012, the Jenkins Complaint alleged that: "on information and belief, Isabella is currently being deprived of . . . medical and dental care." J.A. Ex. A, at 17; Jenkins Compl. ¶ 81.[8]  The CGL Policy defines bodily injury as "bodily injury, disability, sickness or disease sustained by a person, including death resulting from any of these at any time. 'Bodily injury' includes mental anguish or other mental injury resulting from bodily injury." CGL Policy, J.A. Ex. B, at HAIC-0189.  Hanover is correct that the CGL Policy, under Virginia law and by its terms, excludes coverage for emotional distress or other emotional injury not "*resulting from* bodily injury." CGL Policy, J.A. Ex. B, at HAIC-0189 (emphasis added). Federal courts have long found that, under Virginia law, insurance contracts providing coverage for "bodily injury" do not cover emotional distress. *See, e.g.*, *West American v. Isle of Wight*, 673 F.Supp. 760, 765 (E.D. Va. 1987) ("'bodily injury' encompasses . . . actual physical harm . . . but not emotional distress . . . ."); *American v. Church Schools,* 645 F. Supp. 628, 632–33 (E.D. Va. 1986) ("In giving the 'bodily injury' coverage its plain meaning, it simply does not cover the . . . claim for purely emotional injury.").  The wording of the CGL Policy bolsters this general conclusion by specifying exactly when coverage for "bodily injury" would encompass coverage for "mental anguish or other mental injury;" that is, when the emotional distress "result[s] from bodily injury." CGL Policy, J.A. Ex. B, at HAIC-0189.  Liberty's contention that emotional distress is commonly encompassed by the definitions of "sickness or disease" thus proves unavailing.

Hanover is also correct that the alleged deprivations of medical and dental care, standing alone, do not qualify as bodily injuries under the policies at issue.  In *Rockingham Mutual Insurance Company v. Davis*, 58 Va. Cir. 466 (Va. Cir. Ct. 2002), a Virginia Circuit Court found that allegations claiming a man forcefully grabbed a woman's arm and caused her momentary

---

[8] The Jenkins Complaint is an amended complaint, but both complaints in the Vermont case were filed in 2012.

pain sufficiently alleged qualifying "bodily injury" under an insurance policy that defined "bodily injury" as "bodily harm, sickness or disease, including required care, loss of services and death that results." *Id.* at *3. The court found no "requirement of permanency or external manifestation; *it is sufficient if physical pain is experienced.*" *Id.* (emphasis added). As for the phrase's plain meaning, Black's Law Dictionary defines "bodily injury" as "[p]hysical damage to a person's body." *Black's Law Dictionary* (9th ed. 2009). Likewise, the common definitions of "disease," "disability," and "sickness" all refer to physical conditions that affect a person's ability to function in a normal, healthy manner.[9]

A deprivation of medical and dental health care, especially over time, could *lead to* or *result in* physical damage to a person's body, or to an unhealthy physical condition or illness. But the Jenkins Complaint did not allege these deprivations led to any specific physical damage, pain, or harm to Isabella. Therefore, the Jenkins Complaint did not allege "bodily injury" as defined under Virginia law and as understood in its plain and ordinary meaning.[10]

### b) "Property Damage" under Coverage A of the CGL Policy

Property damage under the CGL Policy means "physical injury to tangible property" or "loss of use of tangible property that is not physically injured." CGL Policy, J.A. Ex. B, at HAIC-0210–HAIC-0211. The Jenkins Complaint alleged Jenkins and Isabella suffered "injury to their business or property, including legal fees, investigative fees, court costs, and unpaid child

---

[9] The Merriam-Webster Online Dictionary defines "sickness" as an "unhealthy condition of body or mind," or "a specific type of disease or illness." *See* "sickness," *Merriam-Webster.com*, http://www.merriam-webster.com/dictionary/sickness (last visited March 28, 2014). A "disease" is defined as "an illness that affects a person, animal, or plant: a condition that prevents the body or mind from working normally." *See* "disease," *Merriam-Webster.com*, http://www.merriam-webster.com/dictionary/disease (last visited March 28, 2014). Disability refers to "a condition (such as an illness or injury) that damages or limits a person's physical or mental abilities." *See* "disability," *Merriam-Webster.com*, http://www.merriam-webster.com/dictionary/disability (last visited March 28, 2014).

[10] Since I find the Jenkins Complaint does not allege covered "bodily injury," I need not and do not decide whether the deprivation allegedly occurring "currently" in 2012 fell within the 2009-2010 CGL Policy's period of coverage.

support obligations *and deprivation of personal property*."   Jenkins Compl. ¶ 73 (emphasis

added).  Jenkins also allegedly lost business from closing the daycare she owned to attend court

proceedings involving Isabella's custody, among other economic losses.  Jenkins Compl. ¶ 79.

The Jenkins Complaint further speculated that Isabella's "freedom of movement is severely

restricted by the Nicaragua Brethren and Lisa Miller and that her standard of living is far below

what even the poorest children in the United States experience."  Jenkins Compl. ¶ 80.

     In Virginia, "any 'potentiality' that the plaintiff's allegations may state a claim covered

by the insurance policy triggers the insurance company's duty to defend."  *Premier Pet Prods.,*

*LLC v. Travelers Property Cas. Co.*, 678 F. Supp. 2d 409, 416 (E.D. Va. 2010).  Black's Law

Dictionary defines "tangible property" as "[p]roperty that has physical form and characteristics."

*Black's Law Dictionary* (9th ed. 2009).  In contrast, "intangible property" is "property that lacks

a physical existence . . . includ[ing] stock options and business goodwill."  *Black's Law*

*Dictionary* (9th ed. 2009).  "[T]angible personal property" encompasses "[c]orporeal personal

property of any kind; personal property that can be seen, weighed, measured, felt, or touched, or

is in any other way perceptible to the senses, such as furniture, cooking utensils, and books."

*Black's Law Dictionary* (9th ed. 2009).

     I find that the Jenkins Complaint alleged that Isabella suffered a "deprivation of personal

property" that qualifies as a "loss of use of tangible property that is not physically injured" under

the CGL Policy.  From the facts alleged in the Jenkins Complaint, it is clear Isabella used to

possess certain items in the United States, like books, toys, clothing, and other material goods,

that she can no longer use in Nicaragua.  *See, e.g.*, Jenkins Compl. ¶ 42 (alleging TRBC elders

"packed up the personal belongings of Lisa Miller in two bags" after she fled the United States

with Isabella and had them delivered to Miller in Nicaragua).  Isabella lost the use of this

tangible personal property when she was abducted in September 2009.  The Jenkins Complaint

therefore potentially stated a claim for covered tangible personal property loss that would fall

within the policy period if it resulted from an "occurrence" within that period.  *See* CGL Policy,

J.A. Ex. B, at HAIC-0211 ("All such loss of use [of tangible property that is not physically

injured] shall be deemed to occur at the time of the 'occurrence' that caused it.").

At the very least, Liberty has made a *prima facie* case that coverage should be triggered

under the Jenkins Complaint.  *See Block*, 754 F. Supp. at 823.  Hanover will have a duty to

defend Liberty against the Jenkins Complaint if that complaint stated a non-excluded

"occurrence" under the CGL Policy.  *See Nat'l Fruit Prod. Co., Inc. v. Fireman's Fund Ins. Co.*,

178 F.3d 1285, at *3 (4th Cir. 1999) ("if coverage is in doubt, the insurance company must

defend," unless "it is clear that an insurance company would not be liable under its contract for

*any* judgment based upon the assertions in the underlying complaint").

### c) "Occurrence" under Coverage A of CGL Policy

The CGL Policy defines "occurrence" as "an accident, including continuous or repeated

exposure to substantially the same general harmful conditions."  CGL Policy, J.A. Ex. B, at

HAIC-0197.  Virginia law has interpreted "occurrence" as synonymous with "accident" and

found the terms "refer to an incident that was unexpected from the viewpoint of the insured."

*AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 536 (Va. 2012).  A court should analyze:

> [N]ot whether the action undertaken by the insured was intended, but rather
> whether the resulting harm is alleged to have been *reasonably anticipated* or the
> natural or probable consequence of the insured's intentional act.

*Id.* (emphasis added).  Hanover therefore has a duty to defend if the Jenkins Complaint alleged

acts by Liberty that would naturally and probably result in the alleged harm to Isabella and

Jenkins.  Put another way, this Court determines whether Liberty was alleged to have committed

acts it could have reasonably anticipated would result in the abduction of Isabella and resulting harm to both her and Jenkins.

Virginia law holds that "an intentional act is neither an 'occurrence' nor an 'accident' and therefore is not covered by the standard policy." *AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 536 (Va. 2012). But it draws a distinction, noting that "even though the insured's action starting the chain of events was intentionally performed, when the alleged injury results from an unforeseen cause that is out of the ordinary expectations of a reasonable person, the injury may be covered by an occurrence policy provision." *Id.* Overall, this means that:

> [T]he dispositive issue in determining whether an accidental injury occurred is not whether *the action* undertaken by the insured was intended, but rather whether *the resulting harm* is alleged to have been reasonably anticipated or the natural and probable consequence of the insured's intentional act. For coverage to be precluded under a CGL policy because there was no occurrence, it must be alleged that the result of an insured's intentional act was more than a possibility; it must be alleged that the insured subjectively intended or anticipated the result of its intentional act or that objectively, the result was a natural or probable consequence of the intentional act.

*Id.* (internal citations omitted).

Since the Jenkins Complaint made claims for only intentional torts, two issues determine whether Liberty's alleged actions qualify as occurrences under the policy. First: whether the Jenkins Complaint alleged sufficient intentional acts committed directly by Liberty, such that it could have anticipated the harm to Isabella and Jenkins. If it could have reasonably anticipated that harm based on its alleged direct actions, there would be no occurrence under the CGL Policy. Second: whether Liberty's agents and employees' expectations can be imputed to Liberty if sufficient direct expectations and conduct are not attributable. In other words, if Liberty's agents and employees were alleged to have committed intentional torts, the issue is whether those agents' reasonable anticipations of harm may be imputed to Liberty such that there was no occurrence under the CGL Policy.

Hanover analogizes the Jenkins Complaint to that in *National Fruit Prod. Co., Inc. v. Fireman's Fund Insurance Company*, 178 F.3d 1285, 1999 WL 270033, at *2–3, 5 (4th Cir. 1999). In *National Fruit*, the complaint alleged intentional sexual harassment and assault by an employee for which an employer would be held liable. *Id.* at *5. The Fourth Circuit found that since the complaint alleged only (a) intentional conduct by an employee, and (b) liability by the employer for that intentional conduct, defendant insurers had no duty to defend or indemnify. There was no "occurrence" or "accident" under that policy when the conduct alleged was entirely intentional, found the Fourth Circuit, noting the complaint did not "allege that [plaintiff] acted negligently in a breach of duty." *Id.* at *5. Instead, the complaint was "remarkably void of the type of 'knew or should have known' language that would put [the insurer] on notice that [the claim] might sound in negligence." *Id.* at *5.

Likewise, in *State Farm Fire & Casualty Company v. Frank*, 2011 WL 1883987 (E.D. Va. 2011), a court found that:

> [B]ecause intentional acts are neither 'accidents' nor 'occurrences,' such conduct does not trigger a liability insurer's duty to defend. Claims of *respondeat superior* asserted against an employer for an employee's intentional acts likewise do not impose a duty to defend.

*Id.* at *10. If the complaint had alleged negligent hiring or retention of the employee, that could have triggered coverage, the *State Farm* court found. *Id. Accord Am. & Foreign Ins. Co. v. Church Sch. in Diocese of Virginia*, 645 F. Supp. 628, 633 (E.D. Va. 1986) (finding "allegations of intentional torts are not covered and impose no duty to defend" under a policy requiring an "occurrence," but finding new allegations alleging negligence, despite questions about their validity, stated claim for an "occurrence").

The actions of an employee may be imputed to an employer under an insurance contract, such that in some cases an insurance company would have no duty to defend an employer for

claims based on the intentional torts of its employees.  *See, e.g.*, *National Fruit*, 1999 WL 270033, at *5; *State Farm Fire & Casualty Co. v. Frank*, 2011 WL 1883987, at *10; *Am. & Foreign Ins. Co. v. Church Sch. in Diocese of Virginia*, 645 F. Supp. at 633.  Yet, the "separation of insureds" provision of the CGL Policy prevents this Court from imputing the intentions of Liberty's alleged agents and employees Hyden, Staver, or Lindevaldsen to Liberty.  Even without that provision, the Jenkins Complaint alleged insufficient facts to hold Liberty vicariously liable for Hyden, Staver, or Lindevaldsen's actions under agency or *respondeat superior* theories.  The Jenkins Complaint also did not sufficiently allege that Liberty was directly liable for the intentional torts, as is required to avoid the duty to defend.  The Jenkins Complaint does allege facts giving rise to a potentially covered claim under the policy: an incident that was unexpected from Liberty's viewpoint, and resulting harm that Liberty could not have reasonably anticipated.  Therefore, the Jenkins Complaint alleged an occurrence under the CGL Policy.  *See* CGL Policy, J.A. Ex. B, at HAIC-0197; *AES Corp.*, 725 S.E.2d at 536.

### *1) "Separation of Insureds" Provision*

The CGL Policy contains a "separation of insureds" provision which states:

> Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage part to the first Named Insured, this insurance applies:
> a. As if each Named Insured were the only Named Insured; and
> b. Separately to each insured against whom claim is made or 'suit' is brought.

CGL Policy, J.A. Ex. B, at HAIC-0208.  An "insured" under the CGL Policy is defined to include "'volunteer workers' only while performing duties related to the conduct of your business, or your 'employees', other than either your 'executive officers' . . . but only for acts within the scope of their employment by you while performing duties related to the conduct of your business."  CGL Policy, J.A. Ex. B, at H-0205.

This Court could find no Virginia precedent interpreting a separation of insureds[11] provision in an insurance contract.  However, a separation of insureds clause is a common fixture in many contemporary insurance contracts, and appears to derive from a "severability of interests" clause that used to appear frequently in insurance contracts.  *See generally Davis v. Nat'l Indem. Co.*, 219 S.E.2d 32, 35 (Ga. App. 1975) (noting severability of interests provisions in insurance contracts were inserted to make it "clear and certain that the named insured and the omnibus or additional insureds were to be treated separately, and that the exclusions or other coverage tests should apply to the particular insureds seeking coverage."); *Sacharko v. Ctr. Equities Ltd. P'ship*, 479 A.2d 1219, 1222 (Conn. 1984) ("Severability of interests provisions were adopted by the insurance industry to define the extent of coverage afforded by a policy issued to more than one insured.").  Virginia courts have interpreted "severability of interests" provisions, and the case law provides some insights about how Virginia law might treat a modern separation of insureds clause.  *See Bankers & Shippers Ins. Co. of New York v. Watson*, 224 S.E.2d 312, 316 (Va. 1976); *Transit Casualty Company v. Hartman's, Incorporated*, 239 S.E.2d 894, 895–97 (Va. 1978).

Two decisions from the Supreme Court of Virginia illustrate that an exclusion in an insurance contract might not apply to one of multiple insureds because a severability of interests clause in the contract would require each insured to be considered separately for each exclusion. In *Bankers & Shippers Insurance Company v. Watson*, 224 S.E.2d 312, 316 (Va. 1976), the court found the severability of interests clause meant that the phrase "the insured" in an insurance policy meant "the person claiming coverage."  The named insured sought coverage for wrongful death claims of those who died in a vehicle struck by the named insured's employee, who was

---

[11] I note that I did find Virginia precedent regarding a "severability of interests" clause, which has a similar effect but is not the same as a "separation of insureds" clause.

driving the named insured's tractor trailer at the time.  *Id.* at 808–09.  A provision of the named insured's policy excluded him from coverage in part because the named insured owned the tractor trailer.  *Id.* at 315, 317.  The Supreme Court of Virginia found the insurance company was nevertheless liable for the wrongful death claims because the named insured's employee claimed coverage.  *Id.* at 815.  The severability of interests clause meant that the employee had to be considered separately, and the exclusion for owners of the tractor trailer did not apply to the employee. *Id.* at 814–15.

In *Transit Casualty Company v. Hartman's, Incorporated*, 239 S.E.2d 894, 895–97 (Va. 1978), the Supreme Court of Virginia declined to find that the the "severability of interests" provision in an insurance contract allowed an owner of property to collect from its liability insurer for damages its property sustained in a collision between two of the named insured's employees.  *Id.* at 895.  The owner of the property collected once for the damages from his collision insurance carrier, and that carrier sought to collect the money it had paid him from his separate liability insurance carrier after the negligent employee driver could not satisfy the debt.  *Id.*  The company claimed the liability carrier should cover the incident because the employee was an insured under the policy and did not own the tractor trailer involved in the collision; therefore, the exclusion would not apply to the employee and he would be covered under the policy.  *Id.* at 895.  Importantly, the court compared *Transit Casualty's* facts with those of *Bankers & Shippers* before finding no coverage.

The court explained that its interpretation of the severability of interests clause in

*Bankers & Shippers*

> gave effect to the severability of interests clause by recognizing each insured as separate and distinct from every other insured qualifying as such under the policy. The result of this recognition . . . is that an exclusion clause which refers to 'the insured' is limited in its application to the insured claiming coverage.

24

*Id.* at 896. That "fair" construction did not "enlarg[e] the obligations undertaken originally by the insurer," but still allowed the "severability of interests clause to serve its designed purpose of making certain that, when a claim is asserted by a member of the public against a permissive user [of an automobile], the latter becomes 'the insured,' with respect to that claim, under the named insured's liability insurance contract." *Id.* at 897. Unlike the interpretation in *Bankers v. Shippers*, the court refused to find in *Transit Casualty* that the named insured's collision insurance company could essentially recover under what was supposed to be a more limited liability policy in the name of the negligent employee, "permit[ting] a windfall" to the named insured and "enlarg[ing] the obligations originally undertaken by the insurer." *Id.*

Since *Transit Casualty*, courts in Virginia and other states have continued to interpret insurance contracts with severability of interests provisions, and more recently separation of insureds clauses, to serve two goals: (1) to apply exclusions distinctly to each "insured" separately under the policy, regardless of whether another insured would be excluded; and (2) to ensure that when the contract seeks to limit the insurance company's obligations, courts defer to the clearly expressed intent of the parties. For the first goal, courts carefully construe each possible insured separately under exclusions referring to "the insured," resulting in coverage for named insureds for incidents caused by other insureds who would not receive coverage. *See, e.g.*, *Unigard Mut. Ins. Co. v. Argonaut Ins. Co.*, 579 P.2d 1015, 1018–19 (Wash. Ct. App. 1978) (finding "the courts have uniformly considered [that] there are separate contracts with each of the insureds, [such that] an excluded act of one insured does not bar coverage for additional insureds who have not engaged in the excluded conduct," and that parents were covered for the intentional torts of their son despite an intentional acts exclusion); *Tri-S Corp. v. W. World, Ins. Co.*, 135 P.3d 82, 92 (Haw. 2006) (finding in "accordance with the majority rule," that "the

25

insured" in a policy's exclusion for bodily injury to an employee of an insured did not exclude coverage for an executive officer of the corporation, as he was considered a separate insured under the policy's "separation of insureds" clause).

However, for the second goal, courts carefully read the language of policy exclusions. If an exclusion refers to "the insured," and the contract contains a separation of insureds clause or a severability of interests clause, an individual insured may be covered despite another insured's exclusion. But if the exclusion refers to "an insured" or "any insured," courts often find that the exclusion of one insured can cause the exclusion of all insureds and a resulting lack of coverage under the policy. The district court in *Pacific Insurance Company v. Catholic Bishop of Spokane*, 450 F. Supp. 2d 1186 (E.D. Wash. 2006), carefully parsed this difference. Collecting cases, it found that when an exclusion referred to "'the insured,' coverage is only precluded when, in fact, the act proximately causing the injury was the direct and intentional wrongful act of the named insured seeking coverage." *Id.* at 1202. In *Pacific Insurance*, a Catholic diocese received coverage under an occurrence-based comprehensive general liability policy, despite the alleged wrongful, intentional sexual abuse committed by its employee priests, also insureds under the policy. *Id.* at 1198–99, 1205. *See also GEICO v. Moore*, 550 S.E.2d 823, 823, 830 (Va. 2003) (finding husband, co-insured and co-owner of automobile, could not recover on behalf of his wife for injuries he sustained due to his wife's negligent driving, despite severability of interests clause, because policy excluded damages resulting from "personal injury to *any* insured") (emphasis added); *King v. Dallas Fire Ins. Co.,* 85 S.W.3d 185, 188–92 (Tex. 2002) (finding coverage for employer for negligent hiring, training, and supervision under occurrence-based policy, for damages resulting from intentional conduct of employees, due to a separation of insureds clause).

26

Overall, the cases show that when an insurance contract contains a severability of interests or separation of insureds clause, courts consider each insured separately under the contract in determining whether provisions excluding "the insured" from coverage apply to that particular insured. A named insured's employees or agents can often be considered "insureds" under the insurance contract, resulting in their conduct being considered separately from that of the named insured. This can result in a named insured being covered despite the exclusion of those other insureds. Indeed, the United States Court of Appeals for the Fourth Circuit appears to be following this trend, as it recently found in an unpublished order that a separation of insureds clause

> may require us to approach the question of coverage solely from [an employer's] perspective. Given this approach, we may conclude the thefts were 'accidents' because [the employer] neither intended nor reasonably could have foreseen that its employees would engage in intentionally tortious conduct.

*IFCO Sys. N. Am., Inc. v. Am. Home Assur. Co.*, 502 F. App'x 342, 347 (4th Cir. 2013) (unpublished). The Fourth Circuit certified a question to the Georgia Supreme Court in *IFCO* about how it should interpret a separation of insureds clause under an occurrence-based commercial general liability policy. At issue was whether an insurance company had a duty to defend an employer for intentional tort claims against its employees. The Fourth Circuit found it necessary to certify the question of Georgia law because the court was "required to address a novel issue of local law which is determinative in the case before [us]." *Id.* at 344–45, 347.

At the very least, the CGL Policy's "separation of insureds" clause creates an ambiguity in the contract that this Court must and will construe in favor of Liberty, the insured. *See Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636–37 (4th Cir. 2005) ("A policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning," and "if an ambiguity exists, it must be construed against the insurer."); *IFCO*, 502 F. App'x at

346–47.  The ambiguity is whether the expectations of Liberty's agents and employees would be imputed to Liberty under the contract.  If they were so imputed,[12] Liberty should have reasonably anticipated or foreseen the incident of Isabella's abduction.  Hanover would have no duty to defend against the Jenkins Complaint under the CGL Policy in these circumstances, because Isaballa's abduction would not qualify as an "occurrence" under the CGL Policy.  The "separation of insureds" clause could very well require this court to separate the intent of Liberty's agents and employees from Liberty's own, as in *Pacific Insurance*, *King*, and *IFCO*.  I conclude that in the present circumstances, I must separate Liberty's expectations from those of its tortfeasor employees.  In the alternative, I construe this ambiguity regarding the "separation of insureds" clause in favor of Liberty, and I find that Hanover has a duty to defend Liberty under the CGL Policy, Coverage A, for occurrence-based property damage.

### 2) Allegations of Authorization, Scope of Employment, and Direct Liability

An employer can be held vicariously liable for the actions of its employees in *respondeat superior*, or for the actions of agents through the doctrines of agency.  In Virginia, agency "is defined as a fiduciary relationship arising from 'the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the agreement by the other so to act.'"  *Hartzell Fan, Inc. v. Waco, Inc.*, 505 S.E.2d 196, 200–01 (Va. 1998).  A principal may manifest consent expressly, or authority may be implied "to the extent reasonably necessary for the agent to have in order to carry out his express authority, . . . within the customs

---

[12]  As explained below, I find the Jenkins Complaint does not sufficiently allege or factually support allegations of Liberty's vicarious liability; therefore, it is doubtful the alleged agents and employees' expectations related to the intentional torts could be attributed to Liberty.  But if the Jenkins Complaint's conclusory allegations sufficiently alleged employment and agency relationships for the purposes of the CGL Policy, those agents and employees would be "insured" persons under the CGL Policy.  *See* CGL Policy, J.A. Ex. B, at H-0205 (listing as "an insured" "'volunteer workers' only while performing duties related to the conduct of your business, or your 'employees', other than either your 'executive officers' . . . but only for acts within the scope of their employment by you while performing duties related to the conduct of your business.").  Therefore, their expectations would be separated from those of Liberty, the named insured, under some interpretations of the "separation of insureds" clause.

and usages of a trade, . . . [or] in an emergency to protect the principal's interest. The law may also imply actual authority from a course of conduct" in which the principal appears to manifest assent to the agent exercising powers not expressly granted. *United States v. Fulcher*, 188 F. Supp. 2d 627, 635 (W.D. Va. 2002). Liability in *respondeat superior* is limited to situations where an employee's act "was within the scope of his employment, *i.e.*, was fairly and naturally incident to his employer's business, was done while he was engaged upon his employer's business, and was done with a view to further his employer's interests." *Roughton Pontiac Corp. v. Alston*, 372 S.E.2d 147, 149 (Va. 1988). A principal "is bound by [its] agent's previously unauthorized act if [it] ratifies the act by accepting its benefits with full knowledge of the relevant facts, or, if upon learning of the act, [it] fails to properly disavow it." *Kilby v. Pickurel*, 396 S.E.2d 666, 668–69 (Va. 1990) (internal citations omitted).

### a. Insufficient allegations of vicarious liability for employees' intentional torts

This case involves only conclusory allegations that tie Liberty to the actions of its alleged agents and employees. Although Hanover cites case law in which insurers had no duty to defend employers for the intentional sexual abuse torts of employees, those cases are inapposite. All the cases cited by Hanover involve sexual assaults and harassment perpetrated on one employee by another employee, or on a student by a teacher, in the school or workplace, and during the school or work day. *See National Fruit*, 1999 WL 270033, at *2; *State Farm Fire & Casualty Co. v. Frank*, 2011 WL 1883987, at *1–2; *Am. & Foreign Ins. Co. v. Church Sch. in Diocese of Virginia*, 645 F. Supp. at 630. Clear ties of *respondeat superior* bound the employer-insured persons in those cases to the intentional torts of their employees, and imputation of their tortfeasor employees' expectations followed as a natural consequence.[13]

---

[13] Additionally, it appears that none of the insurance policies at issue in those cases contained a separation of insureds provision.

In contrast, the Jenkins Complaint alleged no facts supporting direct participation by Liberty itself in the intentional torts or conspiracies to commit intentional torts, in which Hyden, Staver, and Lindevaldsen were allegedly involved. Although the Jenkins Complaint claimed these persons acted as agents or employees of Liberty in committing intentional torts, it does so only in conclusory fashion and provides no facts to support allegations of vicarious liability. Hyden was alleged to be

> a 'student worker' at Liberty University [who] . . . [o]n information and belief . . . sent an email [in 2009] to her coworkers at the law school requesting donations for supplies to send Lisa Miller to enable her to remain outside the country. Lisa Miller's attorney, Matthew Staver was the Dean of the Law school and [Hyden's] boss. . . . Hyden [also] called Lisa Miller's father . . . to assist in arranging her and Isabella's transportation from a Walmart parking lot in Lynchburg, Virginia, to Waynesboro, Virginia, from whence they would depart for Canada and Nicaragua the next day.

Jenkins Compl. ¶ 41. Lindevaldsen and Staver allegedly represented Miller in Virginia and Vermont courts while working for Liberty University "and its related law firm, Liberty Counsel, LLC," and "established a Facebook site and other social media to solicit donations to their organization on behalf of Lisa Miller, and the Facebook site was also used to promote the activities of Lisa Miller and the [Protect Isabella Coalition], whose mission included "prevent[ing] court ordered contact" between Isabella and Jenkins. Jenkins Compl. ¶¶ 22, 27. "Upon information and belief, the President of Liberty University, Jerry Falwell, Jr. donated substantial sums to the [Protect Isabella Coalition] to enable it to produce television and radio commercials condemning the parent-child contact between Janet Jenkins and Isabella Miller-Jenkins as an act of tyranny." Jenkins Compl. ¶ 27.

Furthermore, Staver and Lindevaldsen allegedly "routinely instructed their Law School students that the correct course of action for a person in Lisa Miller's situation would be to engage in 'civil disobedience' and defy court orders." Jenkins Compl. ¶ 47. TRBC members

made public statements after Isabella's disappearance, which were quoted in the Jenkins Complaint. The Jenkins Complaint followed those allegations by alleging that Liberty and TRBC were "[h]ence" liable for these actions as principals and employers because they

> encouraged its [sic] agents to disregard state laws governing parental rights . . . [and] through its [sic] public declaration promoted, condoned, and explicitly ratified its [sic] agent's tortious, racketeering activity. These agents and employees have followed this direction, making TRBC and Liberty University liable in *respondeat superior* for the consequences.

Jenkins Compl. ¶ 49. Finally, Lindevaldsen and Staver were alleged to have written and promoted a book about the events surrounding the abduction, and the Jenkins Complaint implied that Zodhiates was in contact with either Staver or Lindevaldsen after Zodhiates dropped Miller and Isabella off at the Canadian border. Jenkins Compl. ¶¶ 22, 47, 49, 57, 60.

These conclusory links between Liberty and its employees do not make the required agency or *respondeat superior* connections. The complaint alleged Liberty employed Staver and Lindevaldsen as dean and law professor, respectively, and Hyden as a student worker. Staver and Lindevaldsen performed legal work for Miller, which seems to be within the scope of their employment, but does not give rise to liability for Isabella's abduction. None of the complaint's allegations tie this legal work to Isabella's abduction. It is absurd for Hanover to rely on allegations that Liberty, through Staver and Lindevaldsen, somehow ratified Isabella's kidnapping by asserting in the classroom that someone in Miller's position would be justified to engage in civil disobedience of court orders. These statements were allegedly made before the kidnapping. Therefore, the statements could not possibly bind Liberty to Hyden or others' previously unauthorized acts, in part because the statements do not constitute Liberty failing to properly disavow Hyden's or others' actions "upon learning" of them. *See Kilby*, 396 S.E.2d at 668–69. Neither did Liberty somehow accept any benefits of Isabella's kidnapping "with full knowledge of the relevant facts." *Id.* Other actions taken by Staver and Lindevaldsen allegedly

31

occurred after the kidnapping, such as promoting the book about Miller and continued representation of Miller in court. By all indications, Staver and Lindevaldsen pursued these actions in their personal capacities, with no control or manifestation of consent by Liberty to act on its behalf in doing so.

Hyden's actions in helping to arrange transportation for Miller out of the United States and in soliciting donations to other law school employees likewise lack any manifestation of consent by Liberty to act on its behalf and subject to its control. Nor do these actions fall within the scope of Hyden's employment as a student worker, or as "fairly and naturally incident to [Liberty's] business" as a law school, nor "with a view to further [Liberty's] interests" as a law school. *See Roughton Pontiac Corp.*, 372 S.E.2d at 149. Liberty did not ratify these actions simply by continuing to employ Hyden (perhaps in some sort of work study position) while firing a few others for unknown reasons, nor by advocating for civil disobedience to some group of law students in the classroom.

Hanover simply cannot point to any clear reason why it should not have the duty to defend Liberty on these allegations. The intentional torts alleged in the Jenkins Complaint are not tied directly to Liberty by any factual allegations. Liberty cannot act except through its agents and employees as a corporation, and none of those employees or potential agents were factually alleged to have been acting with authorization, ratification, or within the scope of their employment for Liberty. Liberty's employees or alleged agents were either acting in their personal capacities, from what this Court can tell from the Jenkins Complaint, or were simply alleged to be performing legal work for Miller as her attorneys. The Jenkins Complaint failed to allege that Liberty "subjectively intended or anticipated the result of its intentional act or that objectively, the result was a natural or probable consequence of that intentional act," as it must

do to preclude occurrence-based coverage for the harm to Isabella and Jenkins from Isabella's abduction. *AES Corp.*, 725 S.E.2d at 536. Therefore, even if the CGL Policy's "separation of insureds" provision did not prevent the imputation of Hyden, Staver, and Lindevaldsen's expectations to Liberty, the Jenkins Complaint did not allege sufficient facts to make Isabella's abduction, the conspiracy to abduct her, and resulting harm to Isabella and Jenkins "reasonably anticipated" from Liberty's viewpoint.

**b. Jenkins Complaint describes conduct stating a potential, covered claim against Liberty**

As reasoned above, one might wonder whether Hanover has no duty to defend Liberty because it seems likely that the Jenkins Complaint did not state a plausible claim against Liberty. Its allegations were too conclusory to link Liberty to the intentional torts alleged, either directly or vicariously. I answer in the affirmative, for two principal reasons.

First, Virginia law requires Hanover to defend Liberty, not just when a complaint states a *plausible* claim, but "*whenever* the complaint [against the insured] *alleges facts and circumstances, **some of which**, if proved, fall within the risk covered by the policy*" or would be "*potentially* covered by the policy." *See Block*, 754 F. Supp. 2d at 822 (emphasis added); *AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 536 (Va. 2012); *VEPCA v. Northbrook Property & Cas. Ins.,* 475 S.E.2d 264, 265 (Va. 1996). The duty to defend is very broad, indeed "broader than [the] obligation to pay," and arises unless "it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations." *AES Corp.*, 725 S.E.2d at 536.

Second, although the Jenkins Complaint did not state a *plausible* claim that Liberty is vicariously liable for intentional torts, it did describe facts and circumstances, some of which, if proved, would *potentially* be covered by the CGL Policy. The *conduct* alleged in the Jenkins

33

Complaint creates the potential that Liberty could be held liable in negligence, for example for negligent training, supervision, or retention of Hyden, Staver, or Lindevaldsen.  These torts would qualify Isabella's abduction and the resulting harm as "occurrences," or incidents "unintended or unexpected from the viewpoint of the insured."  *AES Corp.*, 725 S.E.2d at 536.  I find that even if the "separation of insureds" provision did not require me to separate Liberty's intent and expectations from those of its employees, and even if the Jenkins Complaint alleged sufficient vicarious or direct liability to bar coverage, the Jenkins Complaint alleged conduct by Liberty that creates potential liability in negligence and triggers Hanover's duty to defend.

In *Travelers Indemnity Company of Connecticut v. Sterling Wholesale, LLC*, No. 2:12CV156, 2013 WL 3816736, at *6 (E.D. Va. July 19, 2013), the court found: "[t]he nature of the policyholder's conduct trumps the form of the action pleaded, requiring the insurance company to defend if any allegations *potentially* state a claim covered by the policy."  *Id.* (citing *Premier Pet,* 678 F. Supp. 2d at 416).  Accordingly, the court in *Travelers* considered "not the nominal claims asserted by the plaintiffs in the underlying lawsuit, but the particular acts alleged."  *Id.* (citing *Transcontinental Ins. Co. v. Caliber One Indem. Co.,* 367 F. Supp. 2d 994, 1004 (E.D.Va.2005)).  The court found, in part, that a complaint alleging counterfeit repackaging of certain medical supplies produced abroad so that the supplies looked like official Johnson & Johnson products could constitute as trademark infringement.  *Id.*  Since one Virginia case found a policy covering "infringement of copyright, title, or slogan" also covered "trademark infringement," the court found the conduct alleged fell within the ambit of that policy provision. *Id.* at *7.  *See also Donnelly v. Transp. Ins. Co.,* 589 F.2d 761, 765–68 (4th Cir. 1978) (finding allegations could either be seen to allege malicious, intentional conduct or simply a breach of fiduciary duty, and construing the policy's coverage for "any act or omission . . . arising out of

the performance of professional services for others in the insured's capacity as a lawyer" in favor of the insured plaintiff because alleging breach of fiduciary duty was not clearly outside the policy's coverage).

In *Fuisz v. Selective Insurance Co. of America*, 61 F.3d 238, 242–44 (4th Cir. 1995), the Fourth Circuit found that a complaint containing both of the following triggered coverage despite an "intentional acts" exclusion: (1) causes of action that would require proof of intentional acts, and (2) causes of action that would only require proof of recklessness or reckless disregard. Allegedly acting with recklessness was sufficient to avoid the "intentional acts" exclusion, and read closely, the complaint alleged defamation both through specific intent to harm, or common-law malice, and through actual malice, which can include reckless disregard for falsity.  *Id.*

The Jenkins Complaint alleges conduct that could fall within a negligent supervision, training, or retention cause of action in Virginia.  "The Supreme Court of Virginia has not yet recognized a cause of action for negligent supervision or for negligent training. Nor has it completely ruled out such a cause of action under Virginia law."  *Hernandez v. Lowe's Home Centers, Inc.*, 83 Va. Cir. 210, at *5 (Va. Cir. Ct. 2011).  Several Virginia courts have recently declined to dismiss complaints claiming negligent supervision.  *See, e.g.*, *id.* (citing *Mangum v. Providence Hall Assocs.,* No. 131955, at 2–3 (Fairfax County Cir. Ct.  Jan. 11, 1995)); *Johnson– Kendrick v. Sears, Roebuck & Co.*, 39 Va. Cir. 314 (Va. Cir. Ct. May 31, 1996); *see generally Garcia v. B & J Trucking, Inc.,* 80 Va. Cir. 633 (Va. Cir. Ct 2010) (finding that as alleged, the employer in an office building "could not possibly supervise an employee while he operates a tractor trailer along the highway.").

In *Hernandez*, a Virginia Circuit Court allowed a plaintiff to proceed on a theory of negligent supervision where the plaintiff claimed that "Lowe's failed to supervise an employee

engaged in dangerous activity such that it harmed a third party invitee" when the employee

dropped a box onto a passerby while attempting to retrieve it from a high shelf. *Hernandez*, 83

Va. Cir. 210, at *3–4. The court found that since Lowe's "directs its employees to climb ladders

to reach heavy items on high shelves in the aisles where its customers shop . . . ordinary care and

skill may require a duty of supervision when Lowe's directs an employee to engage in this

dangerous activity." *Id.* at *4.

Construing both Virginia law and District of Columbia law, a federal district court in the

District of Columbia found that in Virginia:

> Negligent hiring, training, supervision, and retention require a showing of
> common law negligence: that an employer failed to use reasonable care in
> selecting, training, supervising, or retaining an employee, thereby proximately
> causing harm to plaintiff.

*Clark v. Computer Sci. Corp.*, 958 F. Supp. 2d 208, 214 & n.3 (D.D.C. 2013) (noting the court

would assess the claim under Virginia law and quoting Virginia case law regarding the causes of

action). A negligent retention claim in Virginia abides where "an employer . . . is subject to

liability for harm resulting from the employer's negligence in retaining a dangerous employee

who the employer knew or should have known was dangerous and likely to harm." *Southeast*

*Apartments Mgmt., Inc. v. Jackman,* 513 S.E.2d 395, 397 (Va. 1999).

The Jenkins Complaint alleged conduct by Liberty's alleged agents and employees that

could potentially result in liability for Liberty within these causes of action. Hyden allegedly

helped arrange transportation for Miller out of the United States and solicited donations from

other Liberty employees to help sustain Miller in Nicaragua. Jenkins Compl. ¶ 41.

Lindevaldsen and Staver represented Miller in court, but went beyond that representation to raise

funds for her defense, attend press conferences about the case, and write and promote a book

about the events surrounding the abduction. Jenkins Compl. ¶¶ 22, 47, 49, 60. The Jenkins

Complaint implied that Zodhiates was in contact with either Staver or Lindevaldsen after he dropped Miller and Isabella off at the Canadian border.  Jenkins Compl. ¶ 57.  Lindevaldsen and Staver also allegedly "routinely instructed their Law School students that the correct course of action for a person in Lisa Miller's situation would be to engage in 'civil disobedience' and defy court orders."  Jenkins Compl. ¶ 47.  Together, the Jenkins Complaint attributed these actions to Liberty and claimed Liberty

> encouraged its agents to disregard state laws governing parental rights . . . [and] through its public declaration promoted, condoned, and explicitly ratified its agent's tortious, racketeering activity.  These agents and employees have followed this direction, making TRBC and Liberty University liable in *respondeat superior* for the consequences.

Jenkins Compl. ¶ 49.

Even within these pleadings, at trial Jenkins could request an amendment to the pleadings or ask for a jury instruction that Liberty is liable for negligent retention or for failing to train or supervise its employees.  Although the links to show agency or *respondeat superior* for Miller's abduction are missing, Liberty would not be prohibited from proceeding on negligence-based causes of action, even on these conclusory pleadings.

In 2012, the Jenkins Complaint did not allege negligent supervision, training, or retention of Liberty's employees or alleged agents.  Yet, the complaint alleges facts and circumstances for which Liberty could potentially be held liable, because Virginia law allows a party to instruct the jury on an un-pleaded claim or defense if the evidence adduced at trial supports that claim or defense and the facts alleged in the complaint would have given both parties notice of the possibility that it might arise.  *See, e.g.*, *Bennett v. Sage Payment Solutions, Inc.*, 710 S.E.2d 736, 742–43 (Va. 2011).  In *Bennett*, the Supreme Court of Virginia held that the trial court did not err in allowing the defendant to amend its pleadings to add a defense of repudiation before the close of the plaintiff's case in chief, and subsequently in instructing the jury on the repudiation issue.

37

*Id.* Since both sides knew the facts underlying the defense from the content of the pleadings, and because the evidence introduced at trial supported the defense, the trial court properly allowed the amendment and jury instruction. *Id.* at 743. The plaintiff had not been prejudiced, the Supreme Court of Virginia found, because it supported substantial justice to "instruct[] the jury how to properly frame the issues based on the evidence presented at trial," and because the plaintiff knew about, and even offered, the evidence supporting the repudiation defense. *Id.* Consequently, the jury's verdict for the defendant was affirmed. *Id.* at 739, 743.

The Federal Rules of Civil Procedure support this same approach, in allowing complaints to be amended either: (1) within 21 days of a responsive pleading or motion to dismiss, or (2) with the court's leave before trial, which should be given "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(1)–(2); *see also* Fed. R. Civ. P. 15(a), comment on 2009 Amendments (noting "the rule permits one amendment as a matter of course in response to a responsive pleading."). The Federal Rules of Civil Procedure and case law in the Fourth Circuit acknowledge that a complaint can be amended even after judgment has been entered, especially where only the underlying legal theory of the case changes, so long as there is no undue delay, prejudice, bad faith, or futility. *Laber v. Harvey*, 438 F.3d 404, 426–28 (4th Cir. 2006) (citing Fed. R. Civ. P. 15, 59, 60). Additionally, Rule 51(b) acknowledges that a party may request jury instructions "on issues that could not reasonably have been anticipated . . . with the court's permission" or at some other designated time "[a]fter the close of the evidence." Fed. R. Civ. P. 51(a)(2).

One district court considered this liberal potential for amendment and jury instructions when it addressed a duty to defend case. The court noted state law precedent "which held that where the complaint makes allegations which are clearly not covered [under an insurance

38

policy], such as an intentional tort, but embraces the potential for a factual finding which is covered, such as negligence, there will be a duty to defend." *Aetna Cas. & Sur. Co. v. Dannenfeldt*, 778 F. Supp. 484, 499-501 (D. Ariz. 1991) (citing *Transamerica Ins. Group v. Meere,* 694 P.2d 181, 189–90 (Ariz. 1984), which found a duty to defend against a complaint alleging an intentional assault and battery because facts suggested the assailant could have negligently caused harm while acting in self defense). The court found no duty to defend where a complaint only alleged wrongdoing by the directors and officers of a company, or wrongdoing their employees were specifically instructed to undertake. *Id.* "[T]o trigger the insurers' obligation to defend under these circumstances," the court held, the insureds would have to "make some factual showing that the lawsuits actually seek damages resulting from the negligence of [the company's] employees, rather than or in addition to, the wrongdoing of the directors and officers." *Id.* at 500–01.

*Bennett* and *Dannenfeldt* show the facts alleged in the Jenkins Complaint can create a potential for liability and trigger Hanover's duty to defend, even if not yet supported by a formally-pleaded, covered cause of action. The instant case is much like *Bennett*, in that facts pleaded in the Jenkins Complaint may support a negligent training, supervision, or retention claim that could be added to the pleadings and jury instructions during trial.

Liberty could be liable, potentially through Staver, for retaining Hyden, an employee who might have shown herself to be dangerous or likely to cause harm to others, or for failing to use reasonable care in supervising her during the events at issue. *See, e.g.*, Jenkins Compl. ¶¶ 41, 59 (noting that "Matthew Staver was Dean of the Law School and [Hyden's] boss," and that although Hyden solicited donations for Miller, she was still employed at the law school while others were fired or would not approach law enforcement, allegedly "for fear of angering Dean

Staver and losing their jobs.").  As in *Hernandez*, Liberty's employees were engaged in legal representation and involvement with someone defying court orders and perhaps giving indications that she would rather flee with Isabella than comply.  This could be seen as a dangerous activity, for which Liberty did not exercise reasonable care in supervising Hyden, Staver, and Lindevaldsen.  Since Jenkins could put this type of evidence and request an instruction on a non-intentional cause of action, the complaint creates the potential for Liberty's liability for unintentional torts that would not have led Liberty to reasonably anticipate the harm that befell Isabella and Jenkins.  Hanover thus has a duty to defend Liberty under Coverage A of the CGL Policy.  *See, e.g.*, *Bennett*, 710 S.E.2d at 742–43; *Dannenfeldt*, 778 F. Supp. at 499-501; *Travelers*, 2013 WL 3816736, at *6; *Fuisz*, 61 F.3d at 242–44; *Donnelly*, 589 F.2d at 765–68.[14]

### d)  "Expected or Intended Injury" Exclusion

Coverage A of the CGL Policy also includes the following exclusion:

This insurance does not apply to:

a. Expected or Intended Injury

'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

CGL Policy, J.A. Ex. B, at HAIC-0198.  Due to the way Virginia law defines the term "occurrence," a finding that the Jenkins Complaint alleged an "occurrence" under the CGL Policy amounts to a finding that the Jenkins Complaint also alleged harm that would not be "expected or intended from the standpoint of the insured."  *See, e.g.*, *AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 536 (Va. 2012) (finding an "occurrence" refers "to an incident that was

---

[14] I also note that focusing on the conduct alleged in a complaint makes sense, because holding otherwise would hinge an insurer's duty to defend on a plaintiff's pleading skill, or the phase of a case at any given moment.  Instead, if a plaintiff has alleged "facts and circumstances" or conduct which, "if prove[n], fall within the risk covered by the policy," an insurer could become duty-bound to defend an insured from the filing of the complaint, assuming the insured meets the other requirements of the insurance contract.  *Block*, 754 F. Supp. 2d at 822.

unexpected from the viewpoint of the insured," depending on "whether the resulting harm is alleged to have been reasonably anticipated or the natural and probable consequence of the insured's intentional act."). Accordingly, I find the "Expected or Intended Injury" exclusion does not apply to bar Liberty's coverage under the CGL Policy.

I find that the "separation of insureds" provision prevents this Court from imputing the intent and expectations of any authorized agents and employees to Liberty, in the event the conclusory allegations of the Jenkins Complaint qualified these agents and employees as insureds under the CGL Policy. *See* CGL Policy, J.A. Ex. B, at H-0205 (defining as "an insured," "'volunteer workers' only while performing duties related to the conduct of your business, or your 'employees', other than either your 'executive officers' . . . but only for acts within the scope of their employment by you while performing duties related to the conduct of your business."). In the alternative, I find that the Jenkins Complaint did not sufficiently allege authorized agency, ratification of intentional torts, or employees acting within the scope of employment in committing intentional torts. Neither did it sufficiently allege Liberty's direct liability for any intentional torts. It does allege conduct that gives rise to Liberty's potential liability for non-intentional torts. As alleged, this conduct did not lead Liberty to expect or intend the injuries to Isabella. Hanover has a duty to defend Liberty for these "facts and circumstances, some of which, if proved, fall within the risk covered by the policy" or would be "potentially covered by the policy." *Block*, 754 F. Supp. 2d at 822; *VEPCA v. Northbrook Property & Cas. Ins.,* 475 S.E.2d 264, 265 (Va. 1996) (quoting *Lerner v. Safeco,* 245 S.E.2d 249, 251 (Va. 1978)); *see also Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 585 (Va. 1989) (observing that exclusionary language is "construed most strongly against the insurer and the burden is on the insurer to prove that an exclusion applies.").

**2. <u>Coverage B of the CGL Policy: Personal and Advertising Injury</u>**

The CGL Policy covers Liberty for "'personal and advertising injury' caused by an offense arising out of [Liberty's] business," defined as "injury, including consequential 'bodily injury', arising out of one or more of the following offenses: a. False arrest, detention, or imprisonment." CGL Policy, J.A. Ex. B, at HAIC 0201, HAIC-0210.[15] Excluded from coverage are offenses that constitute "Knowing Violation[s] Of Rights Of Another," or "Criminal Acts." *Id.* at HAIC-0202. The policy excludes: "'[p]ersonal and advertising injury' *caused by or at the direction* of the insured *with the knowledge* that the act would violate the rights of another and would inflict 'personal and advertising injury.'" *Id.* at HAIC-0202 (emphasis added). Coverage for a criminal act is excluded for "'Personal and advertising injury' arising out of a criminal act *committed by or at the direction* of the insured." *Id.* at HAIC-0202 (emphasis added).

Liberty qualifies for a defense under this provision as well. First, the Jenkins Complaint alleged multiple covered injuries, including emotional injury to Jenkins and Isabella from their separation; economic loss to Jenkins from the time she has spent away from her business and from lawyer's fees; and physical or intangible injury to Isabella because she has been deprived, on information and belief, of medical care, dental care, and an education. Jenkins Compl. ¶¶ 78–81. The definition of "bodily injury" under Coverage A of the CGL Policy, discussed above, might preclude some of these injuries from recognition. But Coverage B of the CGL Policy, for personal and advertising injury, includes "injury, including consequential bodily injury," arising out of "false arrest, detention, or imprisonment," among other things. Personal "injury" includes emotional harm and perhaps economic loss as well. The plain meaning of the word suggests as

---

[15] The parties focus on false detention and do not dispute whether any other enumerated offense might apply here.

much, and the parties have not disputed that the Jenkins Complaint alleged covered "injury" under this provision.

The personal and advertising injury provision also applies because the Jenkins Complaint alleged unlawful detention or imprisonment of Isabella.  The preamble of the Jenkins Complaint accused the defendants of "intentionally causing [Isabella's] continued detention outside" of Vermont.  Jenkins Compl. at 1, J.A. Ex. A, at 1.  The Jenkins Complaint linked Liberty to Miller's kidnapping scheme at least partly through conduct arising out of its business.  Allegedly, Liberty gave Miller legal advice and Liberty's professors "routinely instructed their Law School students that the correct course of action for a person in Miller's situation would be to engage in 'civil disobedience' and defy court orders."  Jenkins Compl. ¶¶ 22, 31, 47.  Therefore, the personal and advertising injury provision covers Liberty for the  unlawful "detention" of Isabella by Miller, in disobedience of court orders, as promoted, encouraged, and ratified by Liberty through its business of representing Miller and through its classroom advocacy.

Neither of the exclusions applies to bar Liberty's coverage.  The knowing violation exclusion requires that the injury at issue be "caused by or at the direction of [Liberty] with the knowledge that the act would violate the rights of another and would inflict" the personal injury at issue.  CGL Policy, J.A. Ex. B, at HAIC 0202.  Here, it would require that Liberty have caused or directed any emotional, economic, or other injuries to Jenkins or Isabella, *with the knowledge* that the acts causing or directing such injury would violate their rights *and* with the knowledge that the acts would inflict the emotional, economic, or other qualifying injuries.

For the same reasons I found Liberty is entitled to coverage for an "occurrence," for which the expectations of its employees may not be imputed to it, I find the knowing violation exclusion does not apply to bar coverage.  The "separation of insureds" provision and

insufficient allegations of Liberty's vicarious liability prevent this Court from imputing Hyden, Staver, and Lindevaldsen's expectations to Liberty.  The insufficiency of the agency and *respondeat superior* allegations proves even more fatal for the knowing violation exclusion, since that exclusion requires that Liberty have *caused or directed* the infliction of injuries upon Isabella and Jenkins, with knowledge Isabella and Jenkins' rights would be violated.  Although the complaint alleges a conspiracy to commit intentional torts, Liberty's part was in representing Miller, advocating for civil disobedience and disregard of court orders in a classroom setting, and not punishing its employees for their personal activities related to Miller's case.  In combination, these allegations of Liberty's conduct could potentially give rise to a covered claim under the CGL Policy's Coverage B, for personal injury arising from Liberty's business and from unlawful detention.  It does not appear from these allegations that Liberty *caused or directed* the knowing violation of Jenkins and Isabella's rights, knowing that personal injury would result.

The Jenkins Complaint compels a similar conclusion for the criminal acts exclusion, which excludes coverage for personal and advertising injury arising out of a criminal act *committed by or at the direction* of *the* insured.  CGL Policy, J.A. Ex. B, at HAIC-0202 (emphasis added).  The complaint alleged that Liberty conspired to aid Miller in kidnapping Isabella, violating the RICO Act, and conspired to violate Jenkins and Isabella's civil rights.  Kidnapping and RICO violations can certainly constitute criminal acts.

Yet, the allegations insufficiently tie Liberty to any criminal acts either directly or vicariously, as discussed extensively throughout this opinion.  Additionally, the form of action Jenkins pled does not govern.  The Jenkins Complaint contains allegations that could *potentially* state a covered claim that Liberty inflicted injuries through non-criminal legal representation, discussions in the classroom regarding the situation, and unchecked advocacy by Liberty's

44

employees encouraging Miller to avoid or disregard court orders.  Liberty was not *directly* alleged to have advocated that Miller disregard court orders in Virginia or Vermont, much less that she kidnap Isabella.  Hyden allegedly solicited donations and coordinated Miller's departure, but the Jenkins Complaint did not say she acted as Liberty's agent or employee operating within the course of her employment in committing those specific actions.  Compl. ¶ 41.  The complaint's conclusory allegations of Hyden's agency do not suffice.  This conduct could potentially give rise to, *inter alia*, negligent supervision and retention or failure to train claims amounting to less than criminal conduct under the CGL Policy.  The criminal acts exclusion does not apply to bar coverage under the personal or advertising injury provision.  *See, e.g.*, *Bennett*, 710 S.E.2d at 742–43; *Dannenfeldt*, 778 F. Supp. at 499–501; *Travelers*, 2013 WL 3816736, at *6; *Fuisz*, 61 F.3d at 242–44; *Donnelly*, 589 F.2d at 765–68.

### 3.  Conclusion: Hanover has a duty to defend Liberty under the CGL Policy

In conclusion, Hanover has a duty to defend Liberty against the Jenkins Complaint under both Coverage A and Coverage B of the 2009-2010 CGL Policy, and under the 2009-2010 CGL Umbrella Policy.  The Jenkins Complaint alleged covered property damage to Isabella arising out of an occurrence, as that term is defined under Virginia law.  Hanover's duty to defend under Coverage A of the CGL Policy was thus triggered.  The Jenkins Complaint also alleged covered personal and advertising injury arising out of false detention or imprisonment, for which the CGL Policy obligates Hanover to defend Liberty.

### B.  SELL Policy

The 2012 School and Educators Legal Liability Endorsement ("SELL"), effective February 1, 2012, through February 1, 2013, covers claims made against Liberty that were first asserted in the relevant policy period and based on "wrongful acts" by Liberty.  Pl.'s Mot. for

Summ. J. 10; J.A. Ex. D.  There is also an SELL endorsement to the 2012-2013 Umbrella policy

which covers Liberty for essentially the same eventualities as the 2012-2013 SELL provision.[16]

*Id.*; J.A. Ex. E.

> The SELL Endorsement covers Liberty for wrongful acts, defined as:
>
> [A]ny breach of duty, neglect, error, omission, misstatement or misleading statement committed by an insured:
>
> a.  In the *lawful discharge* of the duties that are characteristic of, distinctive or inherent to the operation and functioning of an educational institution; *and*
> b.  While acting *within the course and scope of their duties* for the named insured.

SELL Endorsement, J.A. Ex. D, at C-0217 (emphasis added).  The SELL Endorsement obligates

Hanover to "defend the insured against any 'claim' . . . [a]lleging injury arising out of a

'wrongful act' to which this insurance applies and seeking 'loss' because of such injury."  SELL

Endorsement, J.A. Ex. D, at C-0203, C-0223.  "Loss" is defined as

> a compensatory monetary award, settlement of judgment, including damages for which you may be required by law to indemnify an insured. 'Loss' does not include:
>
> a. Taxes, fines or penalties imposed by law;
> b. The cost of compliance with injunctive or other non-monetary relief; or
> c. The value of tuition or scholarships. However, 'loss' does include tuition expenses, if, at the time of the 'wrongful act', you had programs and facilities that would have provided appropriate special education and related services in accordance with the Individuals with Disabilities Education Act of 1990 and any amendments thereto.

SELL Endorsement, J.A. Ex. D, at C-0216.  The SELL Endorsement excludes "bodily injury,"

"property damage," and "personal and advertising injury" from coverage.[17]    A "claim" is

defined as a "written demand for monetary damages; or . . . [a] 'suit' against an insured for a

'wrongful act' to which this insurance applies."  SELL Endorsement, J.A. Ex. D, at C-0215.

---

[16]   As with the CGL Policy and CGL Umbrella Policy, I will interpret the SELL Endorsement and the SELL Umbrella Endorsement together, referring to them as the "SELL Endorsement."
[17]   These terms are defined for the SELL Endorsement as they have been defined throughout this opinion.

The SELL Endorsement excludes coverage for "Intentional or Criminal Act[s]" for any "claim arising out of any intentional, dishonest, fraudulent, criminal, or malicious act or omission or any willful violation of law by *the insured*."  SELL Endorsement, J.A. Ex. D, at C-0056, C-0203 (emphasis added).  The Intentional or Criminal Act exclusion "precludes coverage for *all insured persons* under the policy regardless whether the person seeking coverage participated in any way in the intentional or criminal acts or omissions."  SELL Policy, J.A. Ex. D, at C-0203.

The parties do not dispute that the Jenkins Complaint made its claims during the relevant policy period of the 2012-2013 CGL Policy, of which the SELL Endorsement is one part.

### 1.  **"[W]rongful act"**

The reasoning I applied to whether the Jenkins Complaint alleged an "occurrence" under the CGL Policy applies similarly to the SELL Endorsement's provisions.  The complaint insufficiently alleged that Liberty is vicariously or directly liable for intentional torts for the exclusion to apply.  Only acts committed essentially within the course and scope of an employee's duties for an educational institution are covered by the SELL Endorsement, by its own definition of "wrongful act."  *See* SELL Endorsement, J.A. Ex. D, at C-0217.  The Jenkins Complaint attributed intentional torts to Hyden, Staver, and Lindevaldsen.  But it never specifically alleged they acted within the course and scope of their duties for Liberty in committing those acts, as Hanover's counsel admitted during the hearing on these motions. Hanover's counsel argued the course and scope connection was implied because the Jenkins Complaint identified those persons as agents of Liberty or as employees, and claimed Liberty was liable through ratification or *respondeat superior* for the actions of its agents and employees. The Jenkins Complaint may very well have meant to imply that connection, but it did not

explicitly state these persons acted in the course and scope of their employment, and it certainly provided no facts to support such an allegation.  Neither did the Jenkins Complaint provide any facts to support its bare allegations that Liberty was somehow directly liable for conspiracies to commit intentional torts.

Hanover would have no duty to defend Liberty under the SELL Endorsement if the intentional torts were the only allegations against Liberty.  None of these allegations qualify as "wrongful acts."  They go beyond mere breach of duty, neglect, and the like, and the Jenkins Complaint made insufficient allegations that Hyden, Staver, or Lindevaldsen acted with authorized agency or within the course and scope of their employment for Liberty in committing the torts.

However, the Jenkins Complaint additionally alleged conduct by Liberty that fits within the endorsement's definition of a "wrongful act."  As I have already discussed, the Jenkins Complaint implied through its factual allegations that Liberty was essentially negligent in urging civil disobedience of court orders and in continuously employing Staver, Hyden, and Lindevaldsen without properly training them, supervising them, or curtailing their activities.  The Jenkins Complaint alleged that within a classroom setting, Staver and Lindevaldsen discussed and urged civil disobedience and disregard of court orders, which impliedly influenced Miller and others who supported Isabella's abduction.  Jenkins Compl. ¶ 47.  On behalf of Liberty's law school, Staver and Lindevaldsen also represented Miller in court, both before and after her disappearance.  Jenkins Compl. ¶¶ 22, 27–32, 43, 59.  Staver and Lindevaldsen, as her attorneys, made representations to the courts about Miller's compliance and whereabouts, and stood behind her at press conferences after court hearings.  *Id.*  Staver, in his position as dean of Liberty's law

school, allegedly fired several staff members, yet did not fire Hyden even after she solicited other law school employees for Miller and Isabella's support.  Jenkins Compl. ¶¶ 41, 57–59.

All of these actions clearly fall within "the lawful discharge of duties that are characteristic of, distinctive or inherent to the operation and functioning of an educational institution."  SELL Endorsement, J.A. Ex. D, at C-0217.  Classroom discussions about civil disobedience, and even saying that a person in Miller's situation should defy court orders, fall well within the parameters of debate and education at a law school.  Representing clients and teaching students about legal representation through clinics is a common and beneficial activity for law schools.  This sometimes includes dealing with the media and courts in the absence of the client.  Making hiring and firing decisions falls well within the responsibilities of many law school deans.  All the actions alleged also fall within the course and scope of employment for professors and the dean of a law school.  These actions and the ways in which they might have supported wrongdoers qualify as "wrongful acts," which include "any breach[es] of duty, *neglect[s], error[s], omission[s],* misstatement[s], or misleading statement[s] committed by *an* insured," so long as committed "while acting within the course and scope of their duties *for the named insured*."  SELL Endorsement, J.A. Ex. D, at C-0217.

## 2. **"[A]ny 'claim' alleging injury arising out of a 'wrongful act' . . . and seeking 'loss'"**

The Jenkins Complaint initiated a suit against Liberty for wrongful acts to which the SELL Endorsement applies, as explained above.  This fits the definition of a "claim."  *See* SELL Endorsement, J.A. Ex. D, at C-0215.  Further, the complaint alleged injury arising out of Liberty's ratification of its employees' conduct, and sought qualified loss for that injury.  The Jenkins Complaint requested "compensatory and punitive damages" against Liberty and others, and listed the following as leading to those damages: Jenkins and Isabella's emotional distress

49

from being separated; legal fees and lost business resulting from having to fight for Isabella's

custody and attempt to locate her; lost child support for Isabella; and future injury to Isabella's

property, business, and employment from her deprivation of proper medical care and education.

Jenkins Compl. ¶¶ 78–83.  These fall well within what would be considered a "compensatory

money award" or "loss."[18]

### 3.  Intentional or Criminal Acts exclusion

I find that Liberty made a *prima facie* showing that the SELL Endorsement covers it for

the wrongful acts alleged in the Jenkins Complaint; thus Hanover's duty to defend under the

SELL Endorsement was triggered by that complaint.  Hanover did not meet its burden to show

the Intentional or Criminal Acts exclusion applies to eliminate that duty to defend.  *Block*, 754 F.

Supp. 2d at 823 (citing *Maryland Cas. Co. v. Cole,* 158 S.E. 873, 876 (Va. 1931)).

The Intentional or Criminal Acts exclusion "precludes coverage for *all insured persons*

under the policy regardless whether the person seeking coverage participated in any way in the

intentional or criminal acts or omissions," for any "claims arising out of any intentional,

dishonest, fraudulent, criminal, or malicious act or omission or any willful violation of law by

*the insured.*"  SELL Endorsement, J.A. Ex. D, at C-0203 (emphasis added).

The SELL Endorsement's exclusion proves thorny because it refers to insureds using

both "the" and "all."  The 2012-2013 CGL Policy, of which the SELL Endorsement is one part,

contains a "separation of insureds" clause.  As discussed previously, this clause means that an

exclusion referring to "the insured" refers to the person claiming coverage.  *IFCO*, 502 F. App'x

---

[18]   At this stage, I need not and do not decide what injuries alleged by the Jenkins Complaint fall within covered "loss" under the SELL Endorsement, and what injuries constitute "property damage" or "personal and advertising injury," which are not covered by the SELL Endorsement.  I simply find that the Jekins Complaint alleged covered "loss," which triggers Hanover's duty to defend under the SELL Endorsement.  *See Block*, 754 F. Supp. 2d at 823 (finding duty to defend "arises whenever the complaint [against the insured] alleges facts and circumstances, some of which, if proved, fall within the risk covered by the policy" or would be "potentially covered by the policy.");  *VEPCA v. Northbrook Property & Cas. Ins.,* 475 S.E.2d 264, 265 (Va. 1996).

at 347; *Bankers & Shippers*, 224 S.E.2d at 316.  The intentional or criminal acts exclusion to the SELL Endorsement bars coverage if a claim, or suit, arises out of excluded conduct "by *the insured*," here Liberty as the entity claiming coverage.  I have found that the Jenkins Complaint insufficiently implicated Liberty in this type of excluded conduct because it insufficiently alleged direct or vicarious liability and facts to support those links.  The "separation of insureds" clause indicates that the intentional or criminal acts exclusion does not apply to Liberty.   Yet, the exclusion seeks to prevent coverage for "*all* insured persons . . . *regardless* whether the person seeking coverage participated in any way" in the excluded conduct.  SELL Endorsement,  J.A. Ex. D, at C-0203 (emphasis added).  This directly contradicts the effect of the "separation of insureds" clause, and could mean that if any insured participated in the excluded conduct, the exclusion still applies to the insured seeking coverage.  *See, e.g.*, *GEICO*, 550 S.E.2d at 823, 830; *Pacific Insurance*, 450 F. Supp. 2d at 1202.

In these circumstances, the intentional or criminal acts exclusion does not apply to prevent Hanover from providing a defense to Liberty.  This case is unlike many of those that have interpreted exclusions referring to "any insureds" or "all insureds" because it contains a separation of insureds clause *and* language implicating both "all insureds" and "the insured" seeking coverage.  Under one interpretation, using the phrase "all insured persons" might prevent coverage for the Liberty despite a lack of participation in the excluded conduct.  In fact, the exclusion and the separation of insureds clause conflict.  If the language is capable of more than one reasonable meaning, in context, it is ambiguous, and any ambiguities must be construed against the insurer in Virginia.  *Block*, 754 F. Supp. 2d at 823; *City of Chesapeake v. State Self-Insurers Risk Retention Grp, Inc.*, 628 S.E.2d 539, 628 (Va. 2006).  Hanover also bears the

burden to show an exclusion applies, and exclusionary language is "construed most strongly against [Hanover]." *Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 585 (Va. 1989).

At the very least, this conflicting language creates an ambiguity I must and do construe in favor of Liberty in this SELL Endorsement with a separation of insureds clause. Moreover, even if I were to find the SELL Endorsement meant to exclude coverage for "all insureds" when "any insured" committed the excluded acts, the exclusion still would not apply to Liberty. I have repeatedly held that the acts of Staver, Lindevaldsen, nor Hyden were insufficiently tied to Liberty to constitute acts of Liberty's authorized agents or employees. Therefore, they would not qualify as "insureds" under the 2012-2013 CGL Policy, and their intentional or criminal conduct would not preclude Hanover from having to defend Liberty. CGL Policy, J.A. Ex. B, at H-0205 (defining "insured" as "'volunteer workers' only while performing duties related to the conduct of your business, or your 'employees', other than . . . your 'executive officers' . . . but only for acts within the scope of their employment by you while performing duties related to the conduct of your business.").

### 4. **Conclusion: Hanover has a duty to defend Liberty under the SELL Endorsement**

In conclusion, Hanover has a duty to defend Liberty under the SELL Endorsement. The Jenkins Complaint alleged injury arising out of a wrongful act by Liberty to which the SELL Endorsement applies, and the complaint sought loss because of that injury. The intentional or criminal acts exclusion does not apply. First, Liberty was not sufficiently implicated in the intentional, dishonest, fraudulent, criminal, or malicious acts alleged by the Jenkins Complaint. Second, no other persons implicated in such conduct qualify as "insureds" under the policy. Third, even if those persons did qualify as insureds, the separation of insureds clause creates an

ambiguity about whether their conduct precludes coverage for Liberty.  I construe that ambiguity in Liberty's favor.

## V.  Hanover's Motion to Strike

Hanover moves this Court to strike the Affidavit of Dean Staver, submitted with Liberty's response to Hanover's motion to for summary judgment.  *See* Resp. to Defs.' Mot. for Summ. J., Ex. 1.  Liberty acknowledges this Court cannot "consider extrinsic evidence in deciding whether Hanover has a duty to defend Liberty."  Resp. to Defs.' Mot. for Summ. J. 21 n.5.  Hanover agrees, arguing the "duty-to-defend analysis is confined to consideration of the allegations of the [Jenkins] Complaint and the terms of the policies."  Reply on Defs.' Mot. for Summ. J. 15.  Therefore, Hanover asks this Court to strike the Staver Affidavit.  Liberty notes Hanover's accusations about Dean Staver being in contact with Zodhiates, the man who took Isabella and Jenkins to the border "entail serious allegations of criminal conduct by the Dean of the Liberty Law School," and admits "Liberty attaches the affidavit to set the record straight regarding Dean Staver's conduct . . . ."  Resp. to Defs.' Mot. for Summ. J. 21 n.5.

The eight corners rule requires this Court to compare the Jenkins Complaint with each insurance contract to determine whether the complaint alleges any facts and circumstances, some of which, if proved, would potentially be covered by the policies at issue.  *Block*, 754 F. Supp. 2d at 822–23.  As with any other contract, I must first examine the language of the agreement to determine the parties' intentions, and enforce the policy as written if its language is clear and unambiguous.  *Id.* at 823.  As both parties acknowledge, I need not consider extrinsic evidence regarding Dean Staver in determining Hanover's duty to defend.  I accordingly strike the Affidavit of Dean Staver from the record and do not consider it in making my determinations. *See* Resp. to Defs.' Mot. for Summ. J., Ex. 1.

Although Hanover has not moved to strike it, I also note that in making my findings, I have not considered the conclusions of the Vermont federal district court in *Jenkins v. Miller*, --- F. Supp. 2d ---. No. 2:12-CV-184, 2013 WL 5770387 (D. Vt. Oct. 24, 2013). Liberty acknowledges that the eight corners rule requires me to look solely to the complaint and insurance contract in examining coverage. Yet, it repeatedly used the *Jenkins v. Miller* opinion to support its arguments that the Jenkins Complaint did not sufficiently implicate Liberty in intentional torts, and that the complaint insufficiently showed Hyden, Staver, and Lindevaldsen were Liberty's agents in allegedly committing intentional torts. *See, e.g.*, Pl.'s Mot. for Summ. J. 8 n.4; 15 n.8; 21. I need not and have not considered the *Jenkins v. Miller* opinion in coming to any of the conclusions expressed in this opinion.

## VI.  Conclusion

I find that one or more of the defendants has a duty to defend Liberty under the 2009-2010 CGL Policy, under Coverage A and Coverage B, and under the 2009-2010 CGL Umbrella Policy, and that one or more of the defendants has a duty to defend Liberty under the SELL Endorsement to the 2012-2013 CGL Policy, as well as under the SELL Endorsement to the 2012-2013 CGL Umbrella Policy. This duty to defend arises in relation to the Jenkins Complaint, filed on Nov. 26, 2012, in *Jenkins v. Miller et al.*, No. 2:12-cv-00184-wks, in the District of Vermont.

Accordingly, Liberty's motion for summary judgment (docket no. 39) is GRANTED in full, and Hanover's motion for summary judgment (docket no. 42)  is DENIED in full. I reiterate that this memorandum opinion and its accompanying order only determine Hanover's duty to defend, and the issue of whether Hanover has a duty to indemnify Liberty remains unresolved.

The Clerk of the Court is directed to send a certified copy of this order to all counsel of record.

Entered this 16th day of April, 2014.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE